# EXHIBIT A

# **PROJECT AGREEMENT**

THIS Project Agreement (the "**Agreement**") is entered into effective November 18, 2019 (the "**Effective Date**") by and between AiMi, Inc., a Delaware corporation ("**Company**"), and 9245-4628 Quebec Inc. for the services of Stéphane Gervais ("**Producer**"). Company and Producer are sometimes referred to in this Agreement each as a "**Party**" and together as the "**Parties**." In consideration of the Parties' mutual promises set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**1.      Producer's Services**. Producer shall provide professional musical services (the "**Services**") and deliverables in accordance with Exhibit A attached hereto, which is incorporated herein by reference, including any and all draft and final versions of musical works, compositions, sound recordings, computer files or formats that are requested by Company, sound files, cue sheets, and any other works and deliverables produced by Producer in connection with this Agreement (collectively, the "**Work**"). Producer shall create and deliver the Work(s) in accordance with Company's specifications and requirements. The description of the Work set forth in Exhibit A (the "**Deliverables**") shall not reduce or in any way limit Company's rights under this Agreement. Company will conduct a review of all the Deliverables to ensure that the Deliverables are in accordance with the Exhibit A within thirty (30) days of receiving the said Deliverables. If the Deliverables are not in accordance with the Exhibit A, Company will inform the Producer of the non-compliance. Producer will rectify the non-compliance in the Deliverable and send an updated Deliverable to Company for review within five (5) business days of receiving the information about non-compliance at no additional cost to Company. If Producer is unable to remedy any failure or non-compliance of the Deliverable for it to pass Company's review, then, without limiting Company's other rights and remedies, Producer shall promptly refund any payment that Company may have made for the non-conforming deliverable.

**2.      Payment**. For the Services and the Work and all rights under this Agreement, Producer is entitled to receive solely the Fee, as set forth in the Exhibit A, and is not entitled to any other compensation from Company, relating to or arising from this Agreement, Services, or Work. Producer shall supply any tax or other payment documentation, such as a W-9, reasonably requested by Company, prior or after payment of the Fee. Producer is solely responsible for all taxes related to the Work.

**3.      Rights in the Work**. The Parties intend for the Work to be a "work made for hire," as defined in the United States Copyright Act (17 U.S.C. §101 *et seq*.) to the fullest extent permitted under applicable law, as, among other things, a contribution to a collective work and compilation. The Parties do not intend the Work to be a "joint work" as that term is used in the U.S. Copyright Act. The copyright, and all right, title, interest and any other intellectual property rights which may attach to the Work shall belong exclusively to Company. Producer hereby waives and agrees not to assert any moral rights he or she may have to the Work which may inure to him under applicable laws of any nation. Producer represents, warrants and covenants that other artists and/or agents, if any, who perform Services have signed or will sign an agreement containing substantially the same terms as are contained in this Agreement, including this Section 3 and Sections 4, 7, 8, 9, 10, and 18. If the Work is for any reason deemed not to constitute a work made for hire and/or in the event that Producer or Producer's affiliates, heirs or representatives should, by operation of law or otherwise, be deemed to retain any rights to the Work, for good and valuable consideration, including the consideration recited herein, the sufficiency of which is hereby acknowledged, Producer hereby grants, conveys, sells, assigns, transfers and delivers to Company, its successors and assigns, all of Producer's right, title, interest, moral rights, copyrights and any and all other intellectual property rights (whether now known or hereafter created), including any and all other property rights of any nature whatsoever, including the publisher and writer's shares of any composition, in and to the Work.

#4820-0154-1805.5

Producer also agrees that any affiliate, heir and/or representative who obtains any rights to the Work shall be caused, by Producer and the express terms of this Agreement, to assign all right, title and interest in the Work to Company to the maximum extent permitted by law. Producer will, upon the request of Company, its agents and/or attorneys, execute further written agreements to perfect Company's interest in the Work. As between the Parties, solely Company shall be entitled to file any copyright registration applications in connection with the Work, and Producer appoints Company and its attorneys and agents as attorneys-in-fact to execute any necessary documents to register any copyright in any Project or Work.

4. **Term**. This Agreement shall commence as of the Effective Date. Company shall enjoy the absolute right to terminate this Agreement at any time, with or without cause. Upon this Agreement's termination for any reason, Producer shall cease performance of all services in connection to the Work and shall provide the Work, and all material in connection to the Work, to Company in the form requested by Company. If Company terminates this Agreement for convenience (i.e., Producer is not in breach of this Agreement), then Company shall pay a reasonable pro rata share of any deliverables then still due, based on how much of the deliverable Producer has completed. If Company terminates this Agreement as a result of a breach of this Agreement by Producer, Producer shall not be entitled to any compensation in connection with the Work (or any part thereof) or his Services (whether for services or grants of rights in connection therewith). Producer may terminate this Agreement upon thirty (30) days' notice, and only if the latest requested or currently produced "Construction Pack" has been delivered to the Company.

5. **Credit**. Company shall have the irrevocable, perpetual, sublicensable, assignable, worldwide right (but not the obligation), including the right to grant others the right, to use, display, and publish, in any and all media whether now known or hereafter devised, in any manner whatsoever, Producer's (i) personal and/or professional names, and/or (ii) approved likeness, related trademarks, and biographical material, in connection with the use, distribution, exploitation, advertising, and promotion of the Work or any portion thereof. Company shall have the right to credit others or no one for the Work. Producer hereby expressly and forever waives any and all claims and causes of action against Company, its successors, assigns and licensees for any violation of Producer's rights of publicity and/or privacy (including those under Cal. Civ. Code §§ 3344, 3344.1) arising out of or in connection with the foregoing grant. Any failure to accord credit to Producer shall not be deemed a breach of this Agreement.

6. **No Employment Relationship**. It is the express intention of the Parties that Producer is an independent contractor and not an employee, agent, joint venture, or partner of Company for any purpose whatsoever. Producer will determine the method, details, and means of performing the above-described services. The Parties' acknowledge that Company's business is in a field of work that requires little supervision. Producer shall be solely responsible for Producer's equipment, supplies, work environment and all payments to any third party necessary to perform any obligation pursuant to this Agreement. Producer is responsible for payment of all taxes on compensation paid to him under this Agreement including state and federal withholding taxes on income, Social Security and Medicare taxes, and State Disability Insurance payments. Producer may perform services for others during Producer's creation of the Work, but warrants to Company that there does and shall exist no actual or potential conflict of interest concerning the services performed under this Agreement and that Producer's performance hereunder does not require the breach of any agreement or obligation to keep in confidence the proprietary information of any third party.

7. **No Authority to Bind Company**. Producer is an independent contractor of Company and is not, and shall not represent Producer to be, a representative or agent of Company. Neither Producer, nor any partner, agent, or employee of Producer, has authority to enter into contracts that bind Company or creates obligations on the part of Company without the prior express written authorization of Company.

8. **Confidentiality**. In the performance of this Agreement, Producer may have access to Company's information that is considered confidential, private, and proprietary and/or that represent Company trade secrets. Such information, referred to in this Agreement hereafter as "**Confidential Information**," shall include any information acquired by Producer in the course of or in connection with this Agreement or the services performed hereunder, or in any way relating to Company or its affiliates, and all such information shall be deemed to be confidential, private, secret and sensitive and shall be kept confidential and secret. The terms of this Agreement and the authorship of the Work delivered by Producer shall also be considered Confidential Information. Notwithstanding the preceding, Confidential Information does not include information that: (a) was at the time of disclosure or subsequently becomes generally available to the public through no fault or breach on the part of Producer; (b) was rightfully in Producer's possession without an obligation of confidentiality prior to disclosure hereunder; (c) was independently developed by Producer without any breach of this Agreement; or (d) Producer obtained from a third party not known by Producer to be under any confidentiality obligation to Company with respect to such information. Producer agrees, with respect to such Confidential Information, to: (i) use it only to carry out Producer's responsibilities pursuant to this Agreement; (ii) reasonably safeguard it from disclosure; (iii) not disclose it to any person or entity without Company's prior written consent; and (iv) return it in any tangible form to Company upon termination of this Agreement or upon request and to retain no copies or reproductions of such Confidential Information. For sake of clarification, and without limiting the foregoing, Producer may not, without the prior written consent of Company, disclose (x) Producer's involvement in the creation of the Work or (y) Producer's relationship with Company.

(a) **DTSA NOTICE**. The Defend Trade Secrets Act ("**DTSA**"), 18 U.S.C. §1833(b)(1), states that "[a]n individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that—(A) is made—(i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal"; and subsection (b)(2) states that "[a]n individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual – (A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order." Producer(s) thus has/have the right to disclose in confidence trade secrets to Federal, State, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law, and to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure. Nothing in this Agreement is intended to conflict with the DTSA or to create liability for disclosures of trade secrets that are expressly allowed by it.

9. **Warranties / Indemnification**. Producer covenants, represents and warrants to Company that: (i) Producer is an experienced and skilled professional with an existing musical business and/or studio and owns all professional musical equipment and other materials necessary to provide the services hereunder and to create the Work; (ii) Producer has not and will not incorporate into the Work any materials, ideas, and/or documents proprietary in any way to any third party; (iii) the Work will be original and will not infringe the copyright, trademark, trade secret, patent, moral right, and/or other intellectual property right of any third party; (iv) Producer shall comply with all statutes, regulations, ordinances, permit and license requirements, and other laws applicable to Producer's performance under this Agreement, at Producer's sole expense; and (v) the Work will not be created or recorded in a manner that would render the Work subject to the rules or jurisdiction of any labor organization (e.g., American Federation of Musicians). Producer hereby agrees to defend, indemnify and hold Company, its affiliates and related entities, customers, licensees, directors, officers, shareholders, agents, lawyers, and employees harmless against

any and all claims, demands, actions, causes of action, lawsuits, judgments, costs, expenses, attorney and expert witness fees, and other liabilities of every nature, arising out of or related to Producer's creation and/or delivery of the Work and/or for the breach, alleged breach and/or inaccuracy of any of Producer's warranties, representations, and/or covenants contained in this Agreement.

**10.    No Assignment of Personal Services**.  This Agreement is for the personal services of Producer, and specifically Stéphane Gervais, as a professional, experienced artist and neither the Agreement nor Producer's performance hereunder may be assigned by Producer and/or any third party under any circumstances, including by court order, operation of law, statute, regulation, ordinance, or otherwise, without Company's prior express written consent, which consent Company may grant or withhold in its sole and absolute discretion.

**11.    Equitable Relief**. Producer acknowledges that monetary damages would not be an adequate remedy if she or he breaches any provision of this Agreement which protects Company's intellectual property or other proprietary rights, and that the services hereunder are of a unique, innovative, and personal nature and that it is reasonably foreseeable that Producer's failure to perform as required under this Agreement is likely to cause Company irreparable harm and damages. Accordingly, if Producer breaches or threatens to breach any of its obligations relating thereto, Company shall be entitled, without showing or proving any actual damage, to a stipulated temporary restraining order, and shall thereafter be entitled to apply for a preliminary injunction, permanent injunction, and/or order compelling specific performance, to prevent the breach of Producer's obligations under this Agreement. Nothing in this Agreement shall be interpreted as prohibiting Company from pursuing or obtaining any other remedies as otherwise available to it for such actual or threatened breach, including recovery of damages through litigation.

**12.    LIMITATION OF LIABILITY**. EXCEPT FOR A PARTY'S INDEMNIFICATION OBLIGATIONS, IN NO CIRCUMSTANCES WHATSOEVER SHALL ANY PARTY BE LIABLE (WHETHER IN CONTRACT, TORT, OR PURSUANT TO ANY STATUTORY OBLIGATION) TO THE OTHER FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, STATUTORY OR PUNITIVE DAMAGES, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE MAXIMUM LIABILITY OF COMPANY IN ANY CIRCUMSTANCES WHATSOEVER TO PRODUCER SHALL BE THE LESSER OF (A) THE TOTAL SUMS PAID BY COMPANY TO PRODUCER IN THE TWO (2) YEARS PRIOR TO THE ALLEGED WRONGDOING OR BREACH OF THE AGREEMENT OR (B) THE AMOUNTS ACTUALLY PAID BY COMPANY TO PRODUCER IN CONNECTION WITH THE PROJECT IN THE CONTEXT OF WHICH SUCH LIABILITY HAS ARISEN.

**13.    Integration, Modifications and Waivers**. This Agreement constitutes the Parties' entire agreement and understanding and cancels, terminates and supersedes all previous representations, understandings, or agreements, oral or written, between them relating to the subject matter hereof. There are no representations, promises, agreements, warranties, covenants and/or understandings other than those contained herein. Either Party's failure at a particular time to insist upon the other Party's strict performance of any provision of this Agreement will not be construed as a waiver or relinquishment of (or otherwise prevent) its right to later enforce claims arising out of such provision(s). No waiver amendment and/or modification shall be effective unless the Parties expressly agree in writing. No extension of time for the performance of any obligation or act hereunder shall be deemed to be an extension of time for the performance of any other obligation or act hereunder.

**14.     Notice**. All notices pursuant to this Agreement shall be in writing and delivered personally and by email (where given), by overnight delivery service, or by U.S. certified or registered mail, postage prepaid, return-receipt requested and addressed to the Party at each of the addresses following its signature, until proper notice of a new address is given. Notices shall be deemed received upon the earlier of the date of delivery shown on the return-receipt, or the third business day after the date of mailing and e-mailing.

**15.     Interpretation**. This Agreement shall be exclusively interpreted, construed, and enforced in all respects in accordance with the laws of the State of California without reference to its choice of law rules. In the event of a conflict between the terms and conditions of the main body of this Agreement and the Exhibit A, the provisions of this Agreement shall control, unless the Exhibit A expressly identify the section(s) of this Agreement that is/are amended (including by number), and the Parties express their written agreement to such amendment. If any portion of this Agreement is declared invalid or unenforceable for any reason, such portion is deemed severable herefrom and the remainder of this Agreement shall be deemed to be, and shall remain, fully valid and enforceable and shall not affect any other term or provision. All monetary amounts herein are in U.S. Dollars, except for any specific amount for which a different currency is specifically identified. This Agreement shall be interpreted and construed as if such term or provision, to the extent the same shall have been held to be invalid, illegal or unenforceable, had never been contained herein. When necessary for appropriate meaning, a plural shall be deemed to be the singular, a singular shall be deemed to be the plural, and a gender-neutral term shall be deemed feminine or masculine. Section headings are for convenience only and shall not be deemed to govern, limit, modify or in any other manner affect the scope, meaning or intent of the provisions of this Agreement or any part thereof nor shall such captions otherwise be given any legal effect. This Agreement shall be construed within its fair meaning and no inference shall be drawn against the drafting Party in interpreting this Agreement. When used in this Agreement, "including" shall mean "including, but not limited to." This Agreement shall be binding upon and inure to the benefit of the Parties, and their respective heirs, permitted assigns, successors-in-interest, and legal representatives. This Agreement may be executed in counterparts.

**16.     Arbitration**. Except for claims brought pursuant to Section 17, below, any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in San Francisco, California before a single arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. Judgment on the Award shall be final and may be entered in any court of competent jurisdiction.

**17.     Injunctive Relief**.  Notwithstanding the foregoing arbitration provision, Producer agrees that money damages would be an inadequate remedy for Company in the event of Producer's infringement of third party's intellectual property or breach or threat of breach of any confidentiality provision in this Agreement, and that in the event of such an infringement, breach, or threat, Company, in addition to any other remedies to which it is entitled, is entitled to such preliminary or injunctive relief (including an order prohibiting Producer from taking actions in breach of such provisions), without the need for posting bond, and specific performance as may be appropriate. Sole and exclusive venue for any dispute under this Section 17 will be the appropriate state court in San Francisco, California or the United States District Court for the Northern District of California, and the Parties irrevocably consent to the jurisdiction of such courts.

**18.     Survival**. This Agreement's provisions pertaining to rights, limitation of liability, confidential information, proprietary information, indemnification, and each other provision that may reasonably be

interpreted or construed as being intended to survive this Agreement's termination or expiration, shall survive such termination or expiration.

IN WITNESS WHEREOF, the Parties have executed this Agreement personally or by an authorized representative and acknowledge that they understand and agree to be bound by this Agreement's terms and conditions.

| **AIMI, INC.** "COMPANY" | **9245-4628 QUEBEC INC.** "PRODUCER" |
|---|---|
| By: _____ <br> Edward Balassanian <br> Title: President & CEO <br><br> Address: <br> c/o Endanik, LLC <br> 353 Kearney Street <br> San Francisco 94108 <br><br> With a copy of any notice to: <br>     Daniel Schacht, Esq. <br>     Donahue Fitzgerald LLP <br>     1999 Harrison St 26th Floor <br>     Oakland, CA 94612 <br>     Email: dschacht@donahue.com | By: _____ <br> Stephane Gervais <br> Title: President <br><br> Address: <br> 867 rue Alencon <br> Levis, QC <br> G7A4B6 <br> Canada |

## ACKNOWLEDGMENT

I acknowledge that (a) I have granted to 9245-4628 Quebec Inc. all necessary rights to enter into the foregoing Project Agreement and fulfill its obligations; (b) I am bound by the allocation of rights set forth in the Project Agreement, including its Section 3; and (c) I will look solely to 9245-4628 Quebec Inc. for any compensation related to the Producer Agreement, the Services, or the Work.



_____
Stéphane Gervais

**Exhibit A**

**Deliverables**

Deliverables
- 20 Construction Packs in musical genres as requested by Company and agreed to in good faith by Producer
    - Examples of genres: house, deep house, ambient electronica, and chill
- Each Construction Pack must contain the following:
    - an example musical piece as a stereo audio file of 5-7 minutes length
    - a multitrack session from which the piece is constructed. The multitrack session should be delivered as a DAW project with wet and dry tracks of the track types below :
        - Drums (i.e., drumkit or electronic set)
        - Bass
        - Percussion (extra rhythmic elements like congas, guiro, electronic blips and blops)
        - Harmony (tonal elements that define the harmonic content)
        - Melody
        - FX (spacy laser blasts, rising swooshes, etc.)
    
    For example, see below for how wet and dry tracks for each track type, rendered audio on each track segmented into phrases/loops should appear.



- o Each track should contain a collection of loops and phrases in rendered form (i.e., should not require virtual instruments for playback) of 2-8 measures length each. Keys and tempos should be annotated in the project.

- o Tracks should have timbral and stylistic continuity, but with some variation (i.e., not the same drum pattern repeated for 5 minutes). As a rough guide, at least 16 unique dry loops/phrases on each track.

- o Tracks could be bounced together from a project with more tracks. For example, multiple synths could be mixed together to form the harmony track.

- Delivery: Preferred mode of delivery is Ableton session flies.  However, Protools, Logic, Cubase, and Reaper are also acceptable.

- Fee: Producer shall be paid $75.00 USD per hour.

Page 8 of 8

#4820-0154-1805.5