1  DAVID M. JOLLEY, #191164
   djolley@donahue.com
2  DANIEL J. SCHACHT, #259717
   dschacht@donahue.com
3  CORBAN J. PORTER, #270115
   cporter@donahue.com
4  DONAHUE FITZGERALD LLP
   Attorneys at Law
5  1999 Harrison Street, 26th Floor
   Oakland, California 94612-3520
6  Telephone:    (510) 451-3300
   Facsimile:    (510) 451-1527
7

8  Attorneys for Passion Labs, LLC
   and AiMi, Inc.

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11              SAN FRANCISCO DIVISION

12

13 PASSION LABS, LLC, a Texas limited         Case No. 3:25-cv-06672-RS
   liability company; and AIMI, INC., a
14 Delaware corporation,                      **PLAINTIFFS' MOTION
                                              FOR PRELIMINARY INJUNCTION;
15              Plaintiffs,                    MEMORANDUM OF POINTS AND
                                              AUTHORITIES IN SUPPORT THEREOF**
16       v.
                                              Hearing:
17 STEPHANE GERVAIS, an individual; and       Date:  September 4, 2025
   9245-4628 QUEBEC INC., a Canadian          Time: 2:30 p.m.
18 corporation; and DOES 1-10,                Courtroom:  3

19              Defendants.

20

21

22

23

24

25

26

27

28

# Table of Contents

I.      INTRODUCTION ................................................................................................. 3

II.     RELEVANT FACTS ........................................................................................... 4

    A.  Contractual Relationship Between the Parties ...................................................... 4

III.    PROCEDURAL HISTORY ................................................................................ 11

IV.     LEGAL STANDARD ........................................................................................ 12

V.      ARGUMENT ...................................................................................................... 13

    A.  Plaintiffs Are Likely to Succeed on the Merits. .................................................. 13

    B.  Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief. ..................... 15

    C.  Courts Have Issued Preliminary Injunctions on Similar Fact Patterns. .............. 16

    D.  No Security Should Be Required as a Condition for  the Preliminary Injunction. ............. 17

VI.     CONCLUSION ................................................................................................... 17

# TABLE OF AUTHORITIES

**Cases** ............................................................................................................................ **Page(s)**

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2010)................................................................................13

*Alpha Capital, LLC v. Khanukov*,
    2023 WL 4721109 (S.D. Cal. July 21, 2023)........................................................15

*D'Arrigo Bros. of Cal. v. United Farmworkers of Am.*,
    224 Cal. App. 4th 790 (2014)................................................................................13

*Golden Eagle Land Inv., L.P. v. Rancho Santa Fe Assn.*,
    19 Cal. App. 5th 399 (2018)..................................................................................14

*Implicit Conversions, Inc. v. Stine*,
    2024 WL 4112335 (N.D. Cal. Sept. 6, 2024)..................................................15, 16

*Pacific Areospace & Elec., Inc. v. Taylor*,
    295 F. Supp. 2d 1188 (E.D. Wash. 2003) ..........................................................16, 17

*Seaman's Direct Buying Serv., Inc. v. Standard Oil Co.*,
    36 Cal. Cal.3d 752, 768 (1984) ............................................................................13

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001)................................................................................15

*Trump v. Int'l Refugee Assistance Project*,
    582 U.S. 571 (2017) ............................................................................................12

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................................12

**Statutes**

Cal. Pen. Code §§ 502, 502 (e)(1)........................................................................13, 14

**Other Authorities**

Federal Rule of Civil Procedure 65, 65(b)(1) ............................................................ 3, 12

Federal Rule of Civil Procedure 65 ..............................................................................3

Local Civil Rule 7-2 ....................................................................................................3

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT, on September 4, 2025, at 2:30 p.m., or as soon thereafter as counsel may be heard, in Courtroom 3 (17th Floor) of the above-captioned court located at 450 Golden Gate Avenue, San Francisco, California, 94102, via remote proceedings on Zoom, Plaintiffs PASSION LABS, LLC ("Passion Labs") and AIMI, INC. ("AiMi") (collectively "Plaintiffs") will and hereby make this motion for preliminary injunction ("Motion") requiring, enjoining, and/or directing Stephane Gervais ("Gervais") and 9245-4628 Quebec Inc. ("Quebec Inc.") (collectively "Defendants") as follows:

1.     Defendants must return possession and control of all passwords to Plaintiffs' internal and external electronic platforms, accounts, and licensed software (specifically including the Passion Labs YouTube Brand Account, TouchDesigner, and Team Viewer), so as to restore Plaintiffs' ability to operate their business and to return to the pre-July 27, 2025 status quo prior to Defendants' disruptive sabotage and resignation;

2.     Defendants must restore the previously existing files, code, and servers in an operative form on Plaintiffs' internal and external electronic platforms allowing the Storyboard application to run and function, which would return Plaintiffs' operations to the pre-July 27, 2025 status quo prior to Gervais's disruptive conduct and resignation, including restoring the working demo state and the most recent code that (a) supported a visual output at 512 x 512 resolution with live prompting, (b) supported 2k resolution without live prompting, and (c) supported a 40" x 10" high definition display with live prompting;

3.     Return all of Plaintiffs' property in Defendants' possession, custody, or control;

4.     Refrain from directly or indirectly accessing, obtaining, retrieving, copying, deleting, destroying, altering, using, disclosing, selling, licensing, transferring, or disseminating any hard or electronic copies of documents or data containing Plaintiffs' confidential and/or proprietary information, files, code, systems, or applications.

This Motion is based on the Complaint in this action (ECF No. 1), Plaintiffs' Ex Parte Application For Temporary Restraining Order And Order To Show Cause Re: Preliminary Injunction (ECF No. 5) and supporting documents including its Memorandum of Points and

1  Authorities in Support Thereof (ECF No. 5), the Declaration of David M. Jolley (ECF No. 5-1), the

2  Declaration of Edward Balassanian (ECF No. 5-2); the Declaration of Daniel J. Schacht (ECF No.

3  9); this Motion and its accompanying Memorandum of Points and Authorities and Supplemental

4  Declaration of Edward Balassanian; as well as any other evidence or argument presented at or before

5  the time this motion is heard by the Court.

6       As set forth below in the Memorandum of Points and Authorities, a preliminary injunction

7  is necessary to prevent immediate and irreparable harm to Plaintiffs. Plaintiffs have created

8  "Storyboard," a cutting-edge artificial intelligence ("AI") application that incorporates AI-generated

9  music with matching AI-generated visual art in a manner that uniquely synchronizes the two

10 elements. On July 28, 2025, without warning, Gervais – a computer programmer contracted by

11 Plaintiffs, and the lead coder on the Storyboard project – hacked Plaintiffs' computer systems and

12 accounts, changing their passwords and account emails, disabling their access to internal platforms

13 and systems, and altering the files and code to Storyboard preventing the application from operating.

14 Making matters worse, Defendants have made threats to further delete, alter, or destroy Plaintiffs'

15 files and code, and they have threatened to use and/or distribute Plaintiffs' files and code for their

16 own benefit going forward. Plaintiffs respectfully request that a preliminary issue requiring,

17 enjoining, and/or directing Defendants (i) to restore the status quo in Plaintiffs' computer files,

18 systems, servers, and passwords as those items existed prior to July 27, 2025; (ii) to return any of

19 Plaintiffs' property in Defendants' possession, custody, or control, including passwords and

20 accounts; and (iii) to refrain from accessing, altering, deleting, disseminating, selling, and/or using

21 Plaintiffs' confidential and/or proprietary information, files, code, systems, or applications in any

22 way.

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule 7-2, Plaintiffs seek a preliminary injunction requiring, enjoining, and/or directing Defendants (i) to restore the status quo in Plaintiffs' computer files, systems, applications, and passwords as those items existed prior to July 27, 2025, (ii) to return any of Plaintiffs' property in Defendants' possession, custody, or control, and (iii) to refrain from accessing, altering, deleting, disseminating, selling, and/or using Plaintiffs' confidential and/or proprietary information, files, code, systems, or applications in any way.

A preliminary injunction is necessary to prevent irreparable harm to Plaintiffs. After years of development, testing, and hard work, Plaintiffs created "Storyboard," a cutting-edge AI application that incorporates AI-generated music with matching AI-generated visual art in a manner that uniquely synchronizes the two elements.

For the past six years, Gervais (through his corporate entity Quebec Inc.) worked as an independently contracted computer programmer for AiMi, and most recently as the lead coder on the Storyboard project. On July 28, 2025, without warning, Gervais hacked Plaintiffs' computer systems and accounts, changing their passwords and account emails, disabling their access to internal platforms and systems, and altering the files and code to Storyboard preventing the application from operating. Due to Defendants' unlawful sabotage, Plaintiffs have been unable to use Storyboard in any fashion. This effectively has shut down the company's ability to market Storyboard – their crown jewel – to potential customers. Making matters worse, Defendants have made threats to further delete, alter, or destroy Plaintiffs' files and code, and they have threatened to use Plaintiffs' files and code for their own benefit going forward. Without Defendants being forced to undo the harm they have caused, Plaintiffs' development efforts will be set back six to twelve months, which – for a company in the fast-moving AI market – would likely be a death blow. Because Defendants have refused to reset Plaintiffs' code, applications, and passwords to the status quo of how Plaintiffs' systems existed before Defendants' destructive sabotage, Plaintiffs respectfully request that the Court issue a preliminary injunction to return their internal systems to the pre-July 27 status quo and prevent ongoing and irreparable harm.

## II.      RELEVANT FACTS

### A.      Contractual Relationship Between the Parties

In 2019, AiMi entered into an agreement with Quebec Inc. for the services of Gervais, entitled "Project Agreement." Declaration of Edward Balassanian (ECF No. 5-2) ("Balassanian Decl.") ¶ 3; *see also* Declaration of David M. Jolley (ECF No. 5-1) ("Jolley Decl."), Ex. 1 (Complaint at Ex. A). Quebec Inc. appears to be a personally owned corporation used by Gervais to minimize his tax liability. Balassanian Decl. ¶ 7. In addition to signing the Project Agreement on behalf of Quebec Inc., Gervais personally acknowledged in that document that he was granting all ownership to any work created from his services to AiMi. *See* Jolley Decl. Ex. 1 (Complaint at Ex. A and Section 3, thereto).

That same year, AiMi and Quebec Inc. also entered into a "Nondisclosure Agreement" (signed by Gervais on behalf of Quebec Inc.) in which both parties agreed that an unauthorized disclosure of AiMi's confidential and proprietary information that the parties were using in their development projects would cause AiMi great and irreparable injury and damage. Supplemental Declaration of Edward Balassanian (filed concurrently herewith) ("Suppl. Balassanian Decl.") ¶ 5, Ex. 2 at Section 14. Accordingly, Quebec Inc. agreed that AiMi is entitled to "injunctive and other equitable relief in the event of a breach or intended or threatened breach by [Quebec Inc.]" of the nondisclosure requirements. *Id.*

Starting no later than 2020, the parties agreed to expand the scope of the Project Agreement to cover additional services provided by Gervais, as evidenced by the parties' course of dealing. Balassanian Decl. ¶ 5. Defendants were generally paid on a monthly basis, after submitting invoices. AiMi typically made payments to Quebec Inc., but AiMi understood "Quebec Inc." to be interchangeable with "Gervais," with the bottom line being that all payments were for Gervais's services. Balassanian Decl. ¶ 7. Starting in August 2023, AiMi also paid Defendants in stock options. Balassanian Decl. ¶ 8. On or about May 2, 2025, as part of a patent application (and confirming the parties' ongoing agreement as to Defendants' services), Gervais executed an assignment of his entire worldwide right, title, and interest – to the extent not already owned by Plaintiffs – in the Storyboard technology to Passion Labs. Balassanian Decl. ¶ 9 & Ex. 1.

One of the projects for which AiMi engaged Defendants' services pursuant to the Project Agreement, as amended, was called "VJ Live" or, alternatively, "Storyboard" (hereinafter, "Storyboard"). Storyboard involved incorporating AiMi's music generating capabilities with AI-generated visual art that uniquely synchronizes the two elements. Storyboard is intended for use in smaller platforms, such as phones, but also live theater settings and spaces with multiple large high-definition video screens, including a "Passion Theater" built by Plaintiffs specifically for Storyboard. The Storyboard app has two components: a service that generates live streams of images based on prompts and an application that lets users send prompts to the service. Balassanian Decl. ¶ 6.

Though still in development, Storyboard was functioning as intended prior to July 27, 2025. Plaintiffs could demo Storyboard both remotely, including on Zoom calls with prospective customers, and locally on Plaintiffs' Passion Theater. Balassanian Decl. ¶ 10. In July 2025, Plaintiffs moved the internet domain address of Passion Labs, and – as part of that process – they engaged Gervais to "port" Storyboard over to that new internet domain. Balassanian Decl. ¶ 11. On or about July 19, 2025, Defendants confirmed to Plaintiffs that Storyboard was working as intended after the porting process. *Id. See also* Suppl. Balassanian Decl. ¶ 15. There is no product like Storyboard on the market today. *Id.* at ¶ 7. It is similar to using an AI program to generate images using text prompts, except that the images morph in real-time and can synchronize to music, creating, in effect, a live, interactive art piece. *Id.* at ¶ 15. In addition to being artistically impactful, the lack of copyright in the AI output means it can be provided at a much lower price than traditional audiovisual content, which is either poor quality stock-footage that loops after a fixed time, or very expensive and individually-licensed music and video. *Id.* If Plaintiffs still had Storyboard functioning as it did prior to Mr. Gervais' departure and sabotage they would – at least initially – have no competitors. *Id.* at ¶ 7.

**B.    Defendants Hack Plaintiffs' Accounts and Disable Plaintiffs' Technology.**

Despite having made assurances to the contrary, it appears Gervais was unable to advance Storyboard to full functionality in the "cloud" (i.e., not using a personal computer or laptop as a foundation). Balassanian Decl. ¶ 12. Although Gervais continued to act as if everything was on

schedule for such functionality, it appears he may have been growing more and more anxious as the deadline for the "next level" demonstration approached. *Id.* It also appears that when Gervais realized that, after many months of promises, he would not be able to deliver a cloud-enabled product (as opposed to the existing operational laptop or PC based system) to show at an important pitch meeting for a prospective client scheduled for July 29, 2025, he began an extensive process of data destruction and account manipulation rather than simply owning up to the missed deadline. *Id.*

On July 26, 2025, Gervais first hinted that he would not only terminate his services, but also sabotage Plaintiffs' work. Balassanian Decl. ¶ 13. In a text message to Plaintiffs' CEO, Gervais stated that "it's time to pull the trigger" and "You know what I'm heading for here. Bad Times":





*Id.* Unfortunately, Gervais' statements that "I'm not going to do stupid moves on my side" and "I will close clean" proved to be utterly false and, it appears, deliberately misleading. *Id.* ¶ 14. On July 28, 2025, without warning, and fully aware of the important pitch meeting scheduled for the next day, Defendants sabotaged the pitch meeting by hacking AiMi's and Passion Labs's systems, changing their passwords and account emails, disabling their access to important accounts, and disabling Storyboard. *Id.*

1      On July 28, 2025, Gervais sent a resignation letter (the "Letter") entitled "Termination of

2  Services" to Balassanian. Balassanian Decl. ¶ 18; *see also* Jolley Decl. Ex. 1 (Complaint at Ex. B).

3  The Letter falsely claims that Gervais is owed money. Neither Plaintiff had received any invoice

4  from Defendants that had not been paid as of that time. Balassanian Decl. ¶ 18. Indeed, Defendants

5  previously had expressly agreed not to invoice Plaintiffs for their services until no sooner than late

6  August 2025. *Id.* Gervais claims in the Letter, "As a final professional courtesy, and to leave the

7  system in a working state, I am providing access for you to use the currently deployed versions[.]"

8  *See* Jolley Decl. Ex. 1 (Complaint at Ex. B). This statement is entirely untrue. Balassanian Decl. ¶

9  19. In reality, Defendants altered and then left the servers for the Passion Theater in a crippled state.

10  Balassanian Decl. ¶ 20. The routing information was incorrect with routes pointing to the wrong

11  machines, with an inconsistent setup of services. In short, Defendants had destroyed Storyboard's

12  ability to function and left Plaintiffs largely helpless to fix the situation on their own. *Id.*.

13      In addition, in the Letter, Gervais threatens to "shut down" all accounts that he administers

14  for Plaintiffs, "including the main AWS server instance." Balassanian Decl. ¶ 21. Gervais further

15  threatens that "all associated accounts and credentials will be disabled or deleted, without further

16  warning." *See id.* He mockingly tells Plaintiffs to "Please ensure you have completed all necessary

17  backups and copies from these systems prior to this date," knowing full well that this is impossible

18  ***because Gervais has changed the passwords to these accounts and changed the account emails***

19  ***to his own***, preventing Plaintiffs from accessing them, much less making backups and copies. *See*

20  *id.*; *see also* Balassanian Decl. ¶ 22. The accounts that Gervais specifically threatens to hijack

21  include: "Google Workspaces, Groq API Keys, OpenAPI, Claude.ai, GitHub, Slack, GoDaddy

22  delegate access, Unifi Network Administration, local servers, ADT, [and] 1Password[.] *Id.*; *see also*

23  Jolley Decl. Ex. 1 (Complaint at Ex. B). But he also makes clear that he will hijack much more:

24  "any others related to Endanik, Aimi, Passion Group, Passion Labs, Passion Flower, or Implicit

25  Media." *Id.* In addition, he implicitly threatens "all administrative and privileged account passwords

26  and credentials to which I have had access, or could have had access, during the course of this

27  project.** This includes, but is not limited to, cloud infrastructure accounts, system administrator

28  passwords, application credentials, remote access, and any other sensitive systems." *Id.* Moreover,

contrary to the agreement of the parties, Defendants claim in the Letter to have sole ownership and control of the work Gervais created for Plaintiffs, including Storyboard. *Id.*

One of the accounts that Defendants hijacked was Passion Labs's Amazon Web Services ("AWS") account. Balassanian Decl. ¶ 15. AWS provides users cloud computing platforms that include many different services, such as storage, application services, and software tools. *Id.* Although Plaintiffs can "run" Storyboard without access to their AWS account, they cannot fix issues (such as any of the myriad defective code issues left by Gervais), reconfigure it, or otherwise use it as intended. *Id.* ¶ 15. Immediately after Defendants' departure, the Storyboard application was only able to run a non-sensical loop showing images of green witches standing around a kettle. This was not in any way usable as a demo. *Id.* ¶ 16. An email sent to Passion Labs by Amazon shows that it was Gervais who changed the email address associated with Passion Labs's AWS account to his own email address ([admin@g2x.ca](mailto:admin@g2x.ca)) and then changed the AWS password, as shown below. *Id.* ¶ 17.

> **From:** account-update-no-reply via Services <[services@passion.llc](mailto:services@passion.llc)>
> **Subject: Your Amazon Web Services Account Email Has Been Updated**
> **Date:** July 27, 2025 at 2:45:14 PM CDT
> **To:** [services@passion.llc](mailto:services@passion.llc)
> **Reply-To:** [account-update-no-reply@signin.aws](mailto:account-update-no-reply@signin.aws)
>
> Greetings from Amazon Web Services,
>
> As you requested, the email address associated with your AWS account has been updated.
>
> Old email address: [services@passion.llc](mailto:services@passion.llc)
>
> New email address: [admin@g2x.ca](mailto:admin@g2x.ca)
>
> To view or edit your account settings, please visit the "My Account" page at
>
> [https://console.aws.amazon.com/billing/home?#/account](https://console.aws.amazon.com/billing/home?#/account).
>
> For help and support, visit the AWS Support Center at [https://aws.amazon.com/contact-us](https://aws.amazon.com/contact-us).
>
> Thank you for using Amazon Web Services.
>
> Sincerely,
> The Amazon Web Service Team

Although Plaintiffs have managed in recent days to regain access to Passion Labs' AWS account, this does not fix the underlying problem of restoring the functionality of Storyboard, as Gervais deleted or altered much of the internal Storyboard code from what existed prior to his departure.

Suppl. Balassanian Decl. ¶¶ 8, 14. Since regaining access to the Storyboard code, Edward Balassanian ("Balassanian") (CEO of both plaintiffs) and others engaged by Plaintiffs have spent more than 180 hours trying to restore Storyboard's functionality to what it was prior to Defendants' sabotage, but have not been successful. Suppl. Balassanian Decl. ¶ 16.

Another account that Gervais hijacked, but that Plaintiffs have managed to recover with no assistance from Defendants, is Plaintiffs' password management system, 1Password. Suppl. Balassanian Decl. ¶ 12. With this, Gervais had access to all of Plaintiffs' passwords and could access Plaintiffs' servers, remove code, and transfer Plaintiffs' accounts to himself. *Id*. The evidence is clear-cut:



*Id.*

Another account that Gervais unlawfully commandeered is Passion Labs's YouTube Brand Account. Suppl. Balassanian Decl. ¶ 10. Unfortunately, Plaintiffs have been unable to regain access to it. *Id*. Before Gervais' departure this account had demonstration videos of the Storyboard app,

including its audiovisual content and its use in practical, real-world applications such as lobby screens. *Id*. Plaintiffs have used, and plan to use, their YouTube Brand Account and its video content to demonstrate Storyboard to prospective clients. *Id*. It is a very important element of their marketing and client pitches. Gervais used his own account privileges and access to lock Plaintiffs out of the Passion Labs YouTube Brand Account and make the content inaccessible. *Id*. This screenshot shows the result of Gervais' sabotage:



*Id*. In order for Plaintiffs to regain control over the Passion Labs YouTube Brand Account, Gervais would need to link one of Plaintiff's accounts to it, transfer the ownership privileges to that Passion Labs account, and then remove his personal account. *Id*. at ¶ 11. It is also now evident that Gervais blocked Plaintiffs' access to their own software as part of his sabotage. *Id*. at ¶ 13.

Due to Defendants' unlawful sabotage, Plaintiffs have been unable to use Storyboard in any fashion since July 28, 2025. Plaintiffs cannot demonstrate Storyboard to potential customers via Zoom calls, and the Passion Theater has been rendered useless, unable to showcase Storyboard. Balassanian Decl. ¶ 23; Suppl. Balassanian Decl. ¶¶ 14-16.

As for the important July 29 pitch meeting with a large potential customer, without the ability to use Storyboard, it was an embarrassing disaster. Balassanian Decl. ¶ 24. Amazingly, Plaintiffs not only kept this potential customer interested, but entered into an agreement to provide Storyboard for a 90-day period, during with the customer can evaluate Storyboard and, if satisfied, continue to license the production. Suppl. Balassanian Decl. ¶ 17. However, failure to deliver a working

Storyboard app in a matter of a few weeks will doom the relationship. *Id*. Storyboard, if functional, is a hot commodity: Plaintiffs now have eleven new customers waiting for Storyboard to be installed. *Id*. at ¶ 18. Unfortunately, with Storyboard having been rendered non-functional by Defendants' actions, and without Defendants being required to return Plaintiffs' property and restore Plaintiffs' functioning code, those meetings will also fail. *Id*. The six months to a year that it will take Plaintiffs to rebuild Storyboard from scratch, *i.e.*, to redo the work that Defendants did over five years if the Court does not provide immediate relief, will result in a permanent loss of Plaintiffs' clients, established business relationships, goodwill, and first-mover advantage. Suppl. Balassanian Decl. ¶¶ 7, 19-20. Defendants' wrongful conduct, unless and until Defendants are required to return Plaintiffs' property and refrain from further unlawful actions by order of this Court, will cause substantial irreparable injury to Plaintiffs' companies and may result in the demise of Storyboard itself as a viable product. Balassanian Decl. ¶ 25. In order to get Storyboard functioning and the Plaintiffs' businesses operational once again, Plaintiffs need Defendants to return their property and restore the their code and servers to the way they were immediately before Defendants sabotaged them. *Id.*

## III.    PROCEDURAL HISTORY

On August 7, 2025, Plaintiffs filed this lawsuit, setting out claims of breach of contract, breach of the implied covenant of good faith and fair dealing, intentional interference with prospective economic advantage, unfair competition, and unauthorized access to computer data and systems. (Dkt. No. 1). Plaintiffs' counsel corresponded repeatedly with Defendants' counsel before and after filing suit to informally resolve the crisis caused by Defendants' conduct, to little effect. Jolley Decl. ¶¶ 3-8; *see also* Declaration of Daniel J. Schacht (ECF No. 9) ("Schacht Decl.") ¶¶ 5-12. On August 8, immediately after a judge was assigned to the case, Plaintiffs filed an ex parte application for a TRO. *Id.*; *see* ECF No. 5, et seq.

That same day, the Court ordered Plaintiffs "to prove that they have effectuated proper service in accordance with the Federal Rules by noon on Tuesday, August 12." *See* August 8, 2025 Order (ECF No. 6). Plaintiffs' counsel immediately contacted First Legal – a legal support company that provides service of process – to personally serve Defendants with all of the case documents in

Quebec, Canada (where Plaintiffs are located). Schacht Decl. ¶¶ 13-15, and Ex. 5 thereto. On August 11, First Legal effectuated personal service on Defendants of the original Summons,[1] Complaint, all TRO paperwork, and the Court's August 8 Order, and Plaintiffs notified the Court of this service on August 12, immediately after First Legal informed Plaintiffs' counsel. *See* Dkt. No. 11. Despite repeated requests from Plaintiffs' counsel, First Legal was unable to provide an executed "Proof of Service" of these documents until August 19, on which day Plaintiffs filed the executed service documents with the Court. *See* Dkt Nos. 15-16.

On August 15, the Court denied Plaintiffs' ex parte application for a TRO, holding that the alleged harm from a failure to receive *immediate* relief before the adverse party could be heard in opposition would *necessarily* result in irreparable injury. August 15 Order at 5 (Dkt. No. 12). Simply put, the Court found that a failed client meeting (that was not guaranteed of success in the first place) did not support a TRO under the strict requirements of Fed. R. Civ. Pro. 65(b)(1). This finding did not preclude a later order for preliminary injunctive relief, just for immediate relief on an ex parte basis. Accordingly, the Court set a briefing schedule and a September 4 hearing on Plaintiffs request for a preliminary injunction. *Id.* at 6.

## IV.    LEGAL STANDARD

The purpose of a preliminary injunction is "not to conclusively determine the rights of the parties," but instead to balance the equities as litigation moves forward." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Success on the merits" and "irreparable harm" are not required to be *guaranteed*, but must only be shown to be "likely." *Id.* In the Ninth Circuit, courts also use a "sliding scale approach under which a preliminary injunction could issue where the likelihood of success is such that 'serious questions going to the

---

[1] On August 14, 2025, First Legal personally served an Amended Summons on Plaintiffs, which had been executed and issued by the Court on August 12.

merits were raised and the balance of hardships tips sharply in plaintiff's favor.'" *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2010) (quoting *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003)).

## V.     ARGUMENT

### A.     Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs are likely to succeed on the merits of their claims that Defendants' conduct in sabotaging their systems and stealing their passwords, code, and other property breached existing contracts, violated the implied covenant of good faith and fair dealing, interfered with Plaintiffs' prospective economic relationships, and violated California's computer hacking statute (Cal. Penal Code § 502, which provides for civil enforcement).

Breach of Contract / Breach of Implied Covenant of Good Faith and Fair Dealing: As described above, the parties had a contractual relationship through various agreements, whereby Defendants were to develop code to assist in the creation of a functioning AI-application, known to the parties as "Storyboard." The various agreements between the parties assigned all ownership, rights, title, and interest in the Storyboard technology to Plaintiffs, with no ownership retained by Defendants. Plaintiffs performed all obligations required of it under the agreements between the parties. Notwithstanding these facts, Defendants nonetheless sabotaged Plaintiffs' ability to use Storybook, and Defendants have further threatened to destroy completely Plaintiffs' ability to access the Storyboard systems, code, and files and to use and distribute Storyboard independently to Defendants sole benefit. Defendants accordingly deprived Plaintiffs from receiving the benefits of their agreements with Defendants and, by doing so, did not act fairly and in good faith. Plaintiffs have been and continue to be significantly harmed as a result of Defendants wrongful conduct. These facts establish both a breach of contract and a breach of the implied covenant of good faith against Defendants. *See D'Arrigo Bros. of Cal. v. United Farmworkers of Am.*, 224 Cal. App. 4th 790, 800 (2014) (establishing a claim for breach of contract "requires a showing of (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff"); *Seaman's Direct Buying Serv., Inc. v. Standard Oil Co.*, 36 Cal. Cal.3d 752, 768 (1984) (the law implies in every contract a

1    covenant of good faith and fair dealing requiring "that neither party do anything which will

2    deprive the other of the benefits of the agreement").

3        <u>Intentional Interference with Prospective Economic Advantage</u>: As described above,

4    Defendants were well aware of the cutting-edge nature of the Storyboard application and its

5    potential to be a successful and lucrative player in the hot AI market. They knew that Plaintiffs were

6    furiously scheduling marketing meeting and sales pitches to bring Storyboard to market. They were

7    also specifically aware of the important customer pitch scheduled for July 29. Through their actions,

8    including sabotaging Plaintiffs' ability to use Storybook, Defendants have disrupted Plaintiffs'

9    economic relationships with potential customers that likely would have resulted in an economic

10   benefit to Plaintiffs. In fact, the evidence shows that Defendants knowingly intended to disrupt those

11   relationships and did in fact disrupt those relationships, resulting in ongoing injury and harm to

12   Plaintiffs. These facts establish Plaintiffs' claim of intentional interference with prospective

13   economic advantage against Defendants. *See Golden Eagle Land Inv., L.P. v. Rancho Santa Fe*

14   *Assn.*, 19 Cal. App. 5th 399, 429-30 (2018) (establishing intentional interference with prospective

15   economic advantage requires a showing of (1) an economic relationship between plaintiff and some

16   third party with probable economic benefit; (2) defendant's knowledge of the relationship; (3)

17   intentional acts to disrupt the relationship; (4) actual disruption; and (5) injury to plaintiff).

18       <u>Violation of California Penal Code Section 502</u>: As described above, Defendants knowingly

19   accessed computers, computer systems, computer networks, and electronic data owned by Plaintiffs

20   (including accessing and altering passwords and changing account emails) to unfairly and

21   unlawfully restrict Plaintiffs' access to those platforms and data. Defendants did so without

22   Plaintiffs' permission to wrongfully restrict Plaintiffs' access, to wrongfully delete and destroy data,

23   and to wrongfully control and obtain access for themselves, all of which was designed to cause (and

24   did in fact cause) Defendants' harm. These facts establish a violation of California Penal Code

25   Section 502, which may be enforced in a civil action by the owner of the damaged computer system.

26   *See* Cal. Pen. Code § 502(e)(1).

27

28

### B.    Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief.

First off, in 2019, Plaintiffs agreed in a signed contract with AiMi that any unauthorized disclosure or threatened disclosure of AiMi's confidential and proprietary information of the type at issue here would cause irreparable injury and entitle AiMi to injunctive relief. *See* Suppl. Balassanian Decl. ¶ 5, Ex. 2 at Section 14. Moreover, "'an intention to make imminent or continued use of a trade secret or to disclose it … will almost always certainly show irreparable harm.'" *Alpha Capital, LLC v. Khanukov*, 2023 WL 4721109, at \*6 (S.D. Cal. July 21, 2023) (quoting *Pacific Areospace & Elec., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1198 (E.D. Wash. 2003). Here, Defendants have flatly stated that they believe – despite all contractual language to the contrary – that Plaintiffs' proprietary information is theirs to do with as they wish. *See* Balassanian Decl. ¶¶ 18-22; *see also* Jolley Decl. Ex. 1 (Complaint at Ex. B). Defendants' threat to use, distribute, and/or sell the Storyboard technology at issue is an irreparable harm that cannot be cured by money damages – it would result in the destruction of years of planning, research, and development. *See Implicit Conversions, Inc. v. Stine*, 2024 WL 4112335, at \*11 (N.D. Cal. Sept. 6, 2024) (a situation where defendants wrongly believe that plaintiffs' proprietary information "is theirs to do with what they will" creates a high risk of irreparable harm).

In addition, as noted above, the technology used in the Storyboard application is cutting edge, with competitors racing to be the first to bring the technology to market. Plaintiffs were on the brink of introducing their Storyboard product to the market before Defendants' recent sabotage. "Evidence of threatened loss of prospective customers or good will certainly supports a finding of the possibility of irreparable harm." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001). After assessing the damage done by Defendants on their way out the door, Plaintiffs estimate it could take six months to a year to get the application back to where it was without Defendants simply returning what they stole and restoring the status quo. Suppl. Balassanian Decl. ¶ 20. At that point, after so much time has passed, Plaintiffs will have missed out on all its potential customers and lost the goodwill it had built by being one of the early players in this emerging market. *Id*. If forced to wait for either redevelopment by Plaintiffs or injunctive relief at trial, Storyboard will likely be worthless in an industry that will have moved on.

**C.    Courts Have Issued Preliminary Injunctions on Similar Fact Patterns.**

Courts have consistently found that an employee or a contractor who steals a company's confidential or proprietary information, refuses to return it, and threatens to use it for his own benefit warrants equitable relief through a preliminary injunction.

For example, in *Implicit Conversions*, 2024 WL 4112335, a plaintiff video game creator sought a preliminary injunction against two of its former officers who accessed plaintiff's systems and downloaded proprietary data after they had been fired. The defendants refused to accept their terminations and claimed they still had the right to access and use plaintiff's proprietary information. Id. at *1. The Court found that, as the defendants had accessed and downloaded the plaintiff's proprietary information, the plaintiff was likely to prevail on it claims seeking to hold the defendants liable for their actions. Id. at *5. Further, the defendants' contention that the proprietary information "is theirs to do with what they will … creates a high risk that the defendants could use or disclose [the plaintiff's] proprietary information in a way that would irreparably harm the company." *Id.* at * 11. Accordingly, the court enjoined the defendants "from accessing [the plaintiff]'s computer systems and from acquiring, using, or disclosing its confidential, proprietary, and trade secret information.[2] Similarly here, Defendants are in possession of Plaintiffs confidential and proprietary code, and they have stated that they believe that they own it and will use it as they see fit. *See* Balassanian Decl. ¶ 18, Complaint Ex. B (Termination Letter). They should be enjoined from any use or disclosure of that information, as it would result in irreparable harm to Plaintiffs.

Similarly, *Pacific Aerospace & Electronics*, 295 F. Supp. 2d 1188, involved former employees leaving a technology-driven company and attempting to use misappropriated proprietary information for their own benefit. The plaintiff company sought a preliminary injunction requiring,

---

[2] The *Implicit Conversions* court declined to issue a broader injunction requiring the defendants to physically return a computer because, "[c]ritically," defendants claimed it was their personal property, and the preliminary injunction prohibited the defendants from using or disclosing any mis-acquired data on that computer. In that case, unlike here, the plaintiff had regained control over its accounts prior to the hearing on the preliminary injunction. The court advised the plaintiff to come back if it learns that the defendants are violating the order by accessing the data on the computer, in which case the court would revisit the question. Plaintiffs' counsel did not find a case involving any kind of injunctive relief where a defendant still had control of a plaintiff's passwords or accounts.

*inter alia*, that (1) the defendants return all proprietary property belonging to the company and (2) the defendants be enjoined from selling, transferring, licensing, or assigning the proprietary property of the company. *Id.* at 1197-98. The court held that the plaintiff company was likely to prevail on the merits of its claim (*id.* at 1202) and that the defendants' threats of future disclosure of the proprietary information of the company "constitutes irreparable injury justifying injunctive relief by the court." *Id.* at 1204. Accordingly, the court required the defendants "to return all property belonging to [the plaintiff company]" and enjoined them from "selling, transferring, licensing, or assigning" any technology pertaining to the plaintiff company's business products. *Id.* at 1205. Similarly here, Plaintiffs are asking that the Defendants (1) be ordered to return its stolen property to allow its Storyboard application to function properly and (2) be enjoined from using, disclosing, or selling its proprietary information to avoid irreparable harm to Plaintiffs.

### D. No Security Should Be Required as a Condition for the Preliminary Injunction.

Under the Project Agreement, the parties agreed that monetary damages would not be an adequate remedy if Defendants breaches any provision that protects AiMi's intellectual property or other proprietary rights, and accordingly, such a breach will result in AiMi being entitled to a preliminary injunction. *See* Balassanian Decl. ¶ 3; Jolley Decl. Ex. 1 (Complaint at Ex. A ¶ 11 "Equitable Relief"). The parties further agreed in the Project Agreement that any infringement by Defendants of intellectual property rights would entitle AiMi to preliminary or injunctive relief "<u>without the need for posting bond.</u>" *See id.* (Complaint at Ex. A ¶ 17) (emphasis added).

## VI. CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court grant this motion for preliminary injunction.

1  Dated:  August 22, 2025                    DONAHUE FITZGERALD LLP
2                                             Attorneys at Law

3
4                                     By: _____
5                                             David M. Jolley
                                              Daniel J. Schacht
6                                             Corban J. Porter
                                              DONAHUE FITZGERALD LLP
7                                             Attorneys for Passion Labs, LLC  and AiMi, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION