DAVID M. JOLLEY, #191164
djolley@donahue.com
DANIEL J. SCHACHT, #259717
dschacht@donahue.com
CORBAN J. PORTER, #270115
cporter@donahue.com
DONAHUE FITZGERALD LLP
Attorneys at Law
1999 Harrison Street, 26th Floor
Oakland, California 94612-3520
Telephone:   (510) 451-3300
Facsimile:    (510) 451-1527

Attorneys for Plaintiffs
Passion Labs, LLC and AiMi, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PASSION LABS, LLC, a Texas limited liability company; and AIMI, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>STEPHANE GERVAIS, an individual; and 9245-4628 QUEBEC INC., a Canadian corporation; and DOES 1-10,<br><br>Defendants. | Case No. 3:25-cv-06672-RS<br><br>**SUPPLEMENTAL DECLARATION OF EDWARD BALASSANIAN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: September 4, 2025<br>Time: 2:30 PM<br>Dept.: 3<br><br>Judge: Hon. Richard Seeborg |

I, Edward Balassanian, declare as follows:

1. I am the Founder, President and CEO of Plaintiffs AiMi, Inc. ("AiMi") and Passion Labs, LLC ("Passion Labs") (collectively "Plaintiffs") and also Endanik, LLC, the parent company of AiMi and Passion Labs. I have personal knowledge of the facts set forth herein, except as otherwise stated. If called as a witness, I could and would competently testify to the matters stated herein.

2. I make this supplemental declaration in support of the concurrently-filed Plaintiffs' Motion for a Preliminary Injunction.

3. I graduated from the University of Washington with Distinction in Computer Science and started my career at Microsoft, where I worked from 1990-1995.

4. I have been in the technology field as an entrepreneur for over twenty-five years. I founded and funded numerous startups ranging from operating systems to consumer packaged goods. These include my venture lab, Endanik, which builds venture scale AI businesses; Aimi - a portfolio company focused on generative music AI solutions; Strings – a new event platform that brings people together around shared experiences; and Implicit Media – a generative art solution for interactive displays. Previously, I was the founder of BeComm Corporation, a pioneer in building operating systems for digital devices; Be Labs, an IP centric incubator; and Vital Juice, a food manufacturing company. I have successfully raised over $100M in venture capital, created over $500M in enterprise value, and personally interviewed and employed over 200 people. I am the named inventor on over 150 patents in technologies ranging from gesture interfaces, networking, distributed processing to digital music synthesis.

5. Attached hereto as Exhibit 2 is a true and correct copy of a Nondisclosure Agreement dated November 13, 2019, between AiMi, Inc. and 9245 4628 Quebec Inc., signed by myself and Stephane Gervais. In Section 13, it states "The Parties agree that the venue of any law suit, action or legal proceeding arising under this Agreement shall be the State or Federal courts situated in Santa Clara County, California, and the Parties consent to the personal jurisdiction of said courts over such matters, and waive objections to venue including without limitation for inconvenient forum." In Section 14, it states "It is hereby understood and agreed that damages would be an

inadequate remedy in the event of a breach by Recipient of any of said covenants and that any breach by Recipient will cause Discloser great and irreparable injury and damage. Accordingly, Recipient agrees that Discloser is, without waiving any additional rights or remedies otherwise available to Discloser at law or in equity or by statute, entitled to injunctive and other equitable relief in the event of a breach or intended or threatened breach by Recipient of any of said covenants."

6. Mr. Gervais began working on the predecessors to Storyboard in 2020, and Storyboard in 2023. He was the lead coder on the project.

7. There is no product like Storyboard on the market today. If we had Storyboard up and running as it was prior to Mr. Gervais' departure, we would – at least initially – have no competitors. Ownership of the Storyboard intellectual property is crucial to our ability to not only license the project, but also attract investors to Passion Labs and AiMi. A cloud over the ownership would severely negatively impact Passion Labs and AiMi's ability to attract the venture capital needed to keep them operating. In addition, since both companies are spinouts of Endanik – my venture lab – any fundraising efforts there would be similarly hampered.

8. Since August 8, 2025, when I signed my declaration in support of the Temporary Restraining Order (my "TRO Declaration"), Passion Labs has regained control over its Amazon Web Services account, described in Paragraph 17 of my TRO Declaration. This was done with information that Mr. Gervais provided my attorneys, through his attorneys. Mr Gervais has also, since August 8, 2025, provided some of the code that he deleted. This information was all provided after we filed suit and informed him we were seeking a TRO and this preliminary injunction.

9. We have recovered a few of the accounts that Mr. Gervais hijacked, but there are still several that we do not control, as well as a number of expensive software licenses that he has commandeered.

10. The Passion Labs YouTube Brand Account is another account that is no longer under our control due to Mr. Gervais' actions. That channel is located at https://www.youtube.com/@PassionLabs . Prior to the end of July, 2025, this account had videos of the Storyboard App, including showing the app in practical applications such as lobby screens and examples of the audiovisual content generated by Storyboard. We have used, and plan to use, this

account and its video content to demonstrate Storyboard to prospective clients. It is a very important element of our marketing and client pitches. Mr. Gervais used his own account privileges to lock us out of the Passion Labs YouTube Brand Account and make the content inaccessible. We unfortunately have no backups of that content. Below is a true and correct copy of the relevant part of a screenshot, showing that the content is no longer available:



11. In order to regain control over the Passion Labs YouTube Brand Account, Mr. Gervais would need to link one of our accounts to it, and transfer the ownership privileges to that Passion Labs account, before removing his personal account.

12. One of the accounts that Mr. Gervais threatened to commandeer in his Termination Letter was our 1Password account, which is our master password management program that controls passwords for all kinds of other accounts. On or about July 27, 2024, Mr. Gervais did so. He deleted our company accounts (without our authorization, of course) by changing the password and account email, preventing us from accessing our own password manager. Fortunately, we were able to work with 1Password to restore access to our account, with no help from Mr. Gervais. Unfortunately, we were locked out of our accounts for 72 hours and Mr. Gervais had free reign to do as he wanted, which included accessing servers, removing code, and transferring accounts to his own name. Below is a true and correct screen shot of an email I received from 1Password on July 28, 2025:



13. I have now become aware that Mr. Gervais blocked my companies' access to software that Passion Labs or AiMi paid for. That includes TouchDesigner (a visual development platform used as part of Storyboard) and Team Viewer. Passion Labs and AiMi need access to that software to continue to work on Storyboard and other matters. We have been able to regain control of the TouchDesigner account, without any assistance or information from Mr. Gervais, but he has assigned Passion Labs' license to the computer that Passion Labs provided him so that it cannot be used by anyone else. In order to regain access to Passion Labs' TouchDesigner license, Mr. Gervais needs to release it so that we can reassign it to one of our computers.

14. As I noted in my TRO Declaration, Mr. Gervais promised to "leave the system in a working state" and "provid[e] access for you to use the currently deployed versions[.]" This statement by Mr. Gervais remains untrue. Mr. Gervais has not restored the servers for the Passion Theater or given us the access to do so ourselves. The AWS account is one piece of what we need, but it is unfortunately not enough. Mr. Gervais undoubtedly knows this, given his experience and intimate knowledge of Storyboard.

15. As noted in my TRO declaration, Mr. Gervais never provided a functioning cloud-enabled Storyboard or a stand-alone, independent, locally hosted Storyboard. Prior to Mr. Gervais' departure, I personally observed and experienced that Storyboard had the following functionality, which Mr. Gervais sabotaged: (a) it supported a visual output at 512 x 512 resolution with live prompting, (b) it supported 2k resolution without live prompting, and (c) it supported a 40" x 10" high definition display with live prompting, which is the requirement for the prospective client whose pitch meeting on July 29, 2025, Mr. Gervais sabotaged. Live prompting in this context means being able to enter text prompts into the Storyboard app which the app will incorporate into its visual output, all in real time. It is similar to using an AI program to generate images using text prompts, except that the images morph in real-time and can synchronize to music, creating, in effect, a live, interactive art piece. In addition to being artistically impactful, the lack of copyright in the AI output means it can be provided at a much lower price than traditional audiovisual content, which is either poor quality stock-footage that loops after a fixed time, or very expensive and individually-licensed music and video.

16. Since Mr. Gervais' departure, I have personally spent more than 100 hours to try to get Storyboard back to the functionality prior to Mr. Gervais' departure, and two others engaged by AiMi and Passion Labs have spent more than 80 hours to do the same. That does not include time spent to improve the functionality beyond what we had prior to Mr. Gervais' departure. Because of the steps taken by Mr. Gervais to sabotage Storyboard and lock us out of our accounts, we have been unable so far to restore Storyboard's functionality to the state it was prior to Mr. Gervais' departure.

17. We now have an agreement with the then-prospective client from the disastrous July 29, 2025, meeting for a paid, 90-day trial run of Storyboard. They had asked for a follow-up presentation of a fully functional Storyboard on August 20, 2025 and I was able to postpone that date until September 10, 2025, when they want a functional Storyboard showcased in their lobby. We are very fortunate to not have lost the client due to these delays. Any further delay means we will not meet our contractual obligation, and the chance that the client will continue beyond the 90-day trial period is seriously jeopardized.

18. In addition to the client mentioned above, there are at least eleven new clients who have asked us to install Storyboard, which we cannot currently do. It's important not to publicly disclose our clients or potential clients, but I could provide further details if they were kept confidential. Without access in the next few days to our accounts and Storyboard as it was functioning prior to Mr. Gervais' departure, they will in all certainty cancel.

19. Because this is such a new technology, early customers are vitally important to establishing Storyboard as a functioning app, and not "vaporware" – something advertised and promised but non-functional. The companies' reputation and goodwill is irreparably damaged if we cannot provide the promised technology. If we cannot even provide a demo, that affects not just our immediate sales, but also our reputation. There may be reasons why a potential client does not want to license Storyboard, but if it is because they get the impression that Storyboard doesn't actually work and we are just blowing smoke, so to speak, then word can easily get around, irreparably damaging our reputation.

20. Every month matters a lot in this rapidly evolving space. Being first to market, as Storyboard would be if it still had the functionality it had just a few weeks ago, is of immeasurable importance. Even if Mr. Gervais immediately returned all account access and restored Storyboard to its previous condition, we will have lost six to eight weeks due to his actions. If he does not provide that information for several more months, or even a year, we will have to redo years of his work, and it will take us between six months and a year to get Storyboard back to where we were just a few weeks ago. That time lost can never be recovered and means the difference between being first to market and, most likely, chasing competitors in this space at a huge disadvantage.

21. If the Court ordered Mr. Gervais and his company to do the following, it would return things to how they were shortly before he left and sabotaged Storyboard and locked us out of our accounts, and it would prevent irreparable harm to Passion Labs and AiMi:

A. Defendants must return possession and control of all of Plaintiffs' passwords and account access to Plaintiffs' internal and external electronic platforms, accounts, and licensed software (specifically including the Passion Labs YouTube Brand Account, TouchDesigner, and

Team Viewer), so as to restore Plaintiffs' ability to operate their business and to return to the pre-July 27, 2025 status quo prior to Defendants' disruptive sabotage and resignation;

  B. Defendants must restore the previously existing files, code, and servers in an operative form on Plaintiffs' internal and external electronic platforms allowing the Storyboard application to run and function, which would return Plaintiffs' operations to the pre-July 27, 2025 status quo prior to Gervais's disruptive conduct and resignation, including restoring the working demo state and the most recent code that (a) supported a visual output at 512 x 512 resolution with live prompting, (b) supported 2k resolution without live prompting, and (c) supported a 40" x 10" high definition display with live prompting;

  C. Return all of Plaintiffs' property in Defendants' possession, custody, or control;

  D. Refrain from directly or indirectly accessing, obtaining, retrieving, copying, deleting, destroying, altering, using, disclosing, selling, licensing, transferring, or disseminating any hard or electronic copies of documents or data containing Plaintiffs' confidential and/or proprietary information, files, code, systems, or applications.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 22, 2025, at <u>New York, New York</u>.

_____
Edward Balassanian

# EXHIBIT 2

# NONDISCLOSURE AGREEMENT

This Nondisclosure Agreement ("Agreement") is made effective as of 11/13/2019, ("Effective Date"), by and between AiMi Inc ("Discloser"), and 9245 4628 QUEBEC INC. ("Recipient"), on behalf of himself/herself and his/her agents, and/or Representatives (as defined below).

Discloser and Recipient agree as follows:

AGREEMENT

1. Purpose. The Discloser anticipates disclosing information and material during discussions, negotiations or dealings between the Parties, or their respective, relating to facilitating discussions about, and the evaluation of, a potential business relationship between the Parties (the "Purpose"). Some or all of the information and material to be disclosed may be confidential and/or proprietary to the and as such, the Discloser wishes to protect and preserve the confidential and/or proprietary nature of such disclosed information and material. As used herein, "Representatives" means, collectively, the controlled affiliates of each of the Parties, as the case may be, and the respective officers, directors, employees, members, financial advisers, lenders, accountants, attorneys, agents, and controlling persons of each of the Parties, as the case may be, or their controlled or controlling affiliates.. Discloser and Recipient are each individually referred to herein as a "Party" and collectively referred to herein as the "Parties."

2. Confidential Information. "Confidential Information" as used in this Agreement shall mean information disclosed by Discloser to Recipient in connection with the Purpose, even if before the Effective Date, which:

(a) is in written, electronic, photographic, or other tangible form and prominently marked "Confidential", "Proprietary", or "Private", or in any other manner clearly indicating its confidential and/or proprietary nature;

(b) is provided orally or visually with the verbal notice that it is considered Confidential Information under this Agreement, whether or not subsequently summarized in writing following its disclosure;

(c) is known, or should be known, by Recipient as being treated as confidential by the Discloser; and

(d) may relate or relates to (i) information about a Discloser's processes, concepts, methodologies, formats, designs, technology or know-how by which Discloser's existing or future products, services, applications and methods of operation are developed, conducted or operated; (ii) drawings, enterprise relationship diagrams (ERDs), works of authorship, inventions, know-how, techniques, design details and specifications, software programs, software code, and software source documents; (iii) information relating to proprietary rights prior to any public disclosure thereof; information regarding acquiring, protecting, enforcing and licensing proprietary rights (including without limitation patents, copyrights and trade secrets); (iv) information regarding a Discloser's research, development, new service

879\2881020.2                                    1

offerings and products, marketing and selling plans, business plans, budgets, the manner and methods of conducting business, internal services and operational manuals, unpublished financial statements, licensing and distribution arrangements, prices and costs and lists of, or information about, personnel, suppliers and customers; (v) the existence of any business discussions, negotiations or agreements between the parties; and (vi) other significant business information of Discloser's otherwise defined as "trade secrets" under the provisions of the Uniform Trade Secrets Act.

       3.      <u>Termination</u>. This Agreement shall terminate upon the later of (i) five (5) years from the Effective Date, or (ii) the date of termination by either Recipient or Discloser upon not less than two (2) weeks prior, written notice to the other; *provided, however,* that the obligations of Recipient with respect to Confidential Information received prior to the effective date of termination shall survive any such termination.

       4.      <u>Restrictions on Disclosure and Use</u>.

       (a)      Except as allowed herein, Recipient shall not, either during or after the term of this Agreement, disclose Confidential Information to any person or entity without first obtaining the written consent of Discloser, which consent may be granted or withheld in the sole and absolute discretion of Discloser, and Recipient shall take all reasonable precautions to prevent inadvertent disclosure of such Confidential Information.  This prohibition against Recipient's disclosure of Confidential Information includes, but is not limited to, disclosing the fact that any similarity exists between the Confidential Information and information independently developed by another person or entity, and Recipient understands that such similarity does not excuse Recipient from abiding by its covenant or other obligations under this Agreement.

       (b)      Recipient may disclose the Confidential Information to those having a need to know for the Purpose and having an obligation to protect information as required by this Agreement.  Any action or omission of such other personnel shall be deemed an action or omission by Recipient as it relates to Company's Confidential Information, such that Recipient shall be deemed to breach this Agreement for any failure its personnel to abide by Recipient's obligations under this Agreement.

       (c)      Recipient shall not use the Confidential Information other than strictly for the Purpose described herein, and shall take all reasonable precautions to prevent inadvertent use, copying or transfer of such Confidential Information to any third parties.  This prohibition against Recipient's use, copying, or transfer of Confidential Information includes, but is not limited to, disclosing, transferring, selling, licensing or otherwise exploiting, directly or indirectly, any products or services which embody or are derived from Confidential Information.

       (d)      In no case shall Recipient or its affiliate or subcontractor use the Confidential Information to produce goods or services competitive with those of the Discloser.  Recipient agrees not to make any written use of or reference to Discloser's name (or any name under which Discloser does business) for any marketing, public relations, advertising, display or other business purpose without the prior written consent of Discloser, which consent may be withheld or granted in Discloser's sole and absolute discretion.

(e) Recipient agrees not to disclose to any third party that any disclosure of Confidential Information is contemplated to take place or has taken place.

5. <u>Care</u>. Recipient shall use the same degree of care in safeguarding the Confidential Information as it uses for its own confidential and/or proprietary information of like importance, but in no event less than commercially reasonable care. Upon discovery of any disclosure or misuse of Confidential Information, Recipient shall notify Discloser and shall act without delay to prevent any further disclosure or misuse.

6. <u>Exceptions</u>. Recipient's obligation of confidentiality and restriction on use shall not apply to information when it is:

(a) known to Recipient before receipt from Discloser, and such fact is demonstrated to Discloser by pre-existing dated written evidence within five (5) days following disclosure of the information to Recipient;

(b) generally available to the public (or becomes so) without any fault or negligence of Recipient;

(c) received by Recipient from a source other than Discloser who rightfully possesses the information without breach of an obligation of confidentiality owed to Discloser with respect to such Confidential Information; or

(d) independently developed by Recipient without any use of Discloser's Confidential Information.

7. <u>Required Disclosures</u>. Recipient is permitted to disclose Confidential Information as required by law or regulation. In the event disclosure is so required, Recipient must (a) give Discloser written notice promptly upon receipt of a disclosure requirement and before the disclosure is made, (b) take reasonable actions and provide reasonable assistance to Discloser to secure confidential treatment of the Confidential Information, and (c) disclose only such Confidential Information as is legally required.

8. <u>Copies</u>. Recipient shall not transmit electronically, nor make any copies of, the Confidential Information without obtaining prior written consent from Discloser. Any such electronic transmission or copies shall reproduce any proprietary markings included therein.

9. <u>Return</u>. All Confidential Information shall remain the property of Discloser, and all copies and excerpts thereof shall be promptly returned to Discloser or destroyed, provided that an affidavit by an authorized officer of Recipient attesting to such destruction is promptly provided to Discloser, upon request or upon any termination of discussion related to the Purpose or if the transactions contemplated by the Purpose are not consummated, except that Recipient's legal counsel may retain a copy for use only as a record of the disclosure.

10. <u>Rights Not Granted</u>. Nothing herein shall be construed as granting to Recipient any rights, express or implied, in Discloser's Confidential Information, other than the right to use it strictly for the Purpose. Specifically, nothing herein shall be construed as a warranty of any kind regarding the information disclosed to Recipient nor as a grant of any right or license in any

patent, copyright, trademark, invention, discovery, technical data, or other proprietary right included or referred to in the information so disclosed.  This Agreement is not intended to be, nor may it be construed as establishing, a joint venture, partnership, or other formal business organization between or among the Parties.

       11.    <u>Entire Agreement</u>.  This Agreement is the entire agreement between the Parties as to the disclosure of proprietary or confidential information by Discloser to Recipient, and this Agreement supersedes any previous agreements, oral or written, as to its subject matter.  This Agreement may be modified only by written agreement of the Parties.

       12.    <u>Assignment</u>.  Any assignment of this Agreement by Recipient is prohibited absent written authorization of Discloser.

       13.    <u>Governing Law</u>.  This Agreement shall be governed by the laws of the State of California without regard to its choice of law provisions.  The Parties agree that the venue of any law suit, action or legal proceeding arising under this Agreement shall be the State or Federal courts situated in Santa Clara County, California, and the Parties consent to the personal jurisdiction of said courts over such matters, and waive objections to venue including without limitation for inconvenient forum.  Recipient consents to service by mail to the address set forth in the signature blocks, below. In the event such address is not provided by the Recipient with its signature, or absent written notification to Discloser of a change of address, Recipient agrees to the use of the last address for Recipient on the records of Discloser.

       14.    <u>Injunctive Relief</u>.  It is hereby understood and agreed that damages would be an inadequate remedy in the event of a breach by Recipient of any of said covenants and that any breach by Recipient will cause Discloser great and irreparable injury and damage.  Accordingly, Recipient agrees that Discloser is, without waiving any additional rights or remedies otherwise available to Discloser at law or in equity or by statute, entitled to injunctive and other equitable relief in the event of a breach or intended or threatened breach by Recipient of any of said covenants.

       15.    <u>Counterparts.</u>  This Agreement may be executed simultaneously in one or more counterparts, via facsimile, PDF or other electronic format, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[Signature Page Follows]*

5

This Nondisclosure Agreement is made effective as of the Effective Date.

| DISCLOSER: | RECIPIENT: |
|---|---|
| AiMi Inc | 9245 4628 QUEBEC INC. |
| By: _[signature]_ | By: _[signature]_ |
| Name: Edward Balassanian | Name: Stephane Gervais |
| Title: CEO | Title: President |
| Address: 600 Congress, 14th floor | Address: 867 rue Alencon |
| Austin TX 78701 | Levis, QC, G7A4B6, Canada |
| Email: edward@aimi.fm | Email: stephane.gervais@psychnerd.ca |